IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>vs.<br><br>Anthony Ray Shirley,<br><br>    Defendant. | CR13-00622-TUC-RCC(JR)<br><br>**REPORT AND RECOMMENDATION** |

On July 16, 2015, Defendant filed a Motion to Suppress Statements (Doc. 122). The government filed a response on August 13, 2015 (Doc. 129). The matter was heard by Magistrate Judge Rateau on September 9, 2015 (Doc. 130), and on September 18, 2015 (Doc. 135). Defendant was present at both hearings and represented by counsel. The government presented three witnesses (Doc. 131). Two exhibits were admitted at the hearing (Doc. 132). Having considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that Defendant's Motion to Suppress Statements be denied.[1]

---

[1] Trial is currently scheduled for November 24, 2015 and a plea deadline has been set for November 6, 2015. Doc. 126.

I. **FINDINGS OF FACT**

A. **Sgt. Andres Gastelum**

Sgt. Gastelum is assigned to the Patrol Division at the Pascua Yaqui Police Department. TR at 11.[2] On September 16, 2012, at approximately 2:46 a.m., he was dispatched to a residence reference a possible sexual assault. *Id*. at 12. He arrived at the home in his marked patrol car and parked across the street from the house. *Id*. at 14. The other officers identified the suspect by name. *Id*. As Sgt. Gastelum got to the house, he saw a large group of men walking over there; one in particular seemed extremely upset. *Id*. at 15. He saw Officers Medina and Pallanes stop the crowd. *Id*. at 16. Once inside the house, Sgt. Gastelum saw Officer Pallanes handcuff Mr. Shirley with his arms behind his back, escort him out of the house and place him into the back seat of the patrol car. *Id*. at 17, 19, 24. Mr. Shirley was not saying anything, wasn't being loud or boisterous but did smell of intoxicants. *Id*. at18. Sgt. Gastelum stated that he, Officer Pallanes and Officer Medina were all wearing their uniforms and all had their department-issued sidearms on their waist. *Id*. at 22-23.

Sgt. Gastelum drove Mr. Shirley to the detention facility. *Id*. at 20. When asked why he did so, Sgt. Gastelum stated that it was for his own well-being; he wanted to get him out of the area before something bad happened. *Id*. at 20-21. "The crowd that had assembled first was probably now double in size, and there were more people arriving,

---

[2] TR refers to the transcript of the September 9, 2015 hearing. The Court will not cite to the September 18, 2015, hearing as there was no testimony presented. However, a transcript was prepared of counsels' closing arguments.

- 2 -

and they did not seem happy at all.  And it was mainly for his safety, as well as the officers on scene." *Id*. at 20: 15-18.

The drive to the detention facility was only about a third to a fourth of a mile away.  *Id*. at 30.  Sgt. Gastelum did not talk to Mr. Shirley while on route to the detention facility.  *Id*.  Nor did Mr. Shirley make any statements to Sgt. Gastelum.  *Id*. at 38.  Once there, Sgt. Gastelum turned Mr. Shirley over to the detention officer on duty and he processed him.  *Id*. at 31, 33.  Mr. Shirley was placed in a holding cell which was described as a bedroom with bars.  *Id.* at 33, 34.

**B.     Officer Juan Pallanes**

Officer Pallanes is an officer with Pascua Yaqui Police Department.  *Id*. at 41.  On September 16, 2012, at 2:46 in the morning, he was advised by dispatch that a female caller reported that her daughter was sexually assaulted.  *Id*. at 42.  Dispatch advised that the suspect's name was "Anthony Shirley" and that the little girl had pointed to Mr. Shirley saying that he was the man that touched her.  *Id*. at 56-57, 67.  In less than two minutes, Officer Pallanes responded to the scene. *Id*. at 43.

When he first arrived there were four to six people gathered in front of the door to the residence.  *Id*.  When he left the scene there were about 15 people.  *Id*. at 44.  People kept coming from neighboring houses; pedestrians were just walking up to the area.  *Id*.

Upon his arrival, Officer Pallanes immediately made contact with the witnesses.  *Id*.  After speaking to the mother of one of the girls, Officer Pallanes asked for paramedics to respond.  *Id*. at 58. He noted that the little girl was crying during questioning and it was difficult for her to answer his questions.  *Id.*  The mother advised

the officer that there was another victim. *Id*. at 60. While Officer Pallanes did not get more than a preliminary statement from the second little girl, he did hear her disclose to the paramedics explicit details about her encounter with Mr. Shirley. *Id*. at 63-64. According to Officer Pallanes, she had given him "more than enough details to kind of assess whether or not she was truly a victim." *Id*. at 64:7-9.

The mothers advised Officer Pallanes that Mr. Shirley was next door so Officer Pallanes and Officer Medina walked next door. *Id*. at 45, 65. Once at the door, the officers knocked and asked if Mr. Shirley was home. *Id*. at 46. The officers were led inside to where Mr. Shirley was standing. *Id*. at 47. Mr. Shirley did not have shoes on; he was in his socks. *Id*. at 47, 66. When the gentleman who answered the door identified Mr. Shirley to Officer Pallanes, the officer told him to turn around and put his hands behind his back. *Id*. at 48. Officer Pallanes handcuffed Mr. Shirley, put his hand under his biceps area to maintain control of him, and walked him outside. *Id*. at 48-49. As they were walking out, Mr. Shirley asked if he could have his shoes. *Id*. at 49. The officers did not stop but continued out of the residence, across the yard about 50 feet out to Sgt. Gastelum's police car. *Id*. at 49-51. Eventually, Mr. Shirley was given his shoes. *Id*. at 49.

Once inside the police vehicle, Officer Pallanes asked Mr. Shirley for his name. *Id*. at 50. Since it was not the type of question that required *Miranda*, Officer Pallanes did not read Mr. Shirley his *Miranda* warnings. *Id*. at 91. Mr. Shirley responded by saying, "I know I have the right to remain silent, so..." *Id*. at 51:21-22. Officer Pallanes did not ask him any further questions. *Id*. at 51-52. When asked what he understood Mr.

Shirley to mean, Officer Pallanes stated that he "made the determination that, if and when he did decide to make a statement, I wanted it to be official and recorded, documented." *Id*. at 69:5-7.

According to Officer Pallanes, he told Sgt. Gastelum that he wasn't able to get Mr. Shirley's name. *Id*. at 51-52. He also relayed the statement verbatim to Sgt. Gastelum. *Id*. at 78. Officer Pallanes did not recall whether he relayed the statement to any other officer or detective. *Id*. at 80.

### C.   Detective Matthew Leve

Detective Leve is a police officer with the Pascua Yaqui Tribe. *Id*. at 94. At the time of the alleged offense, on September 16, 2012, he was a detective for the criminal investigations department. *Id*. at 96. His job was to investigate allegations of serious crimes. *Id*. At about 2:46 in the morning, he got a call about a sexual assault of a juvenile. *Id*. at 97. Detective Leve called Sgt. Gastelum and received basic information and then went to the scene. *Id*. at 98. When he got to the residence at about 4 a.m., the scene had already been cleared, the children had been transported to the Children's Advocacy Center and Mr. Shirley had been detained and transported to the detention center. *Id.* at 99-100, 118.

At approximately, three o'clock in the afternoon, Detective Leve went to the Pascua Yaqui Detention Center where Mr. Shirley was being detained. *Id*. at 103. Detective Leve had not received information that Mr. Shirley wanted to speak with him; Mr. Shirley had not made it known that he wanted to speak to police. *Id*. at 121. Detective Garcia was with Detective Leve. *Id*. at 105. Mr. Shirley was being held in a

temporary holding cell. *Id*. He was taken out and placed into restraints and taken to the booking room. *Id*. at 105, 108. The restraints were of a type known as a "belly belt," a leather belt wrapped around the front; handcuffs are in the front. *Id*. at 103:22.

Prior to speaking with Mr. Shirley, Detective Leve was told that when Mr. Shirley had been detained, he appeared to be intoxicated. *Id*. at 104. Based on his training and experience, Detective Leve stated that he would not interview a person when he appeared to be intoxicated. *Id*. The detective did admit however, that in his law enforcement career, he investigated a number of DUI cases and in those cases whether a suspect had been drinking or not, they could give a voluntary statement. *Id* at. 124-25. Detective Leve agreed that in a DUI case, if a person who drank alcohol or used drugs said I'm not going to talk to you, he would respect that and not ask any other questions. *Id*. at 126.

By the time Detective Leve saw Mr. Shirley, about 12 hours later, Mr. Shirley did not smell of alcohol or appear to be intoxicated. *Id*. During his interview, Mr. Shirley admitted to having consumed alcohol, smoking an unknown substance, and snorting an unknown drug. *Id*. at 114.

Upon making contact with Mr. Shirley, Detective Leve told him that he was being charged with being suspected of sexual assault on two minor children. *Id*. at 105. After turning on the tape recorder, both detectives introduced themselves and Detective Leve read Mr. Shirley his *Miranda* warnings. *Id*. In order to assist him in advising Mr. Shirley of his rights, Detective Leve used a document entitled "Warnings Per Miranda." Ex. 1. The document sets out *Miranda* warnings in bullet form. *Id*. The last bullet says, "[n]ow having been advised of those rights and understanding these rights, will you answer my

questions?" *Id*. At the bottom of the form, there is a line for the time, date and arrestee's signature. *Id*. According to Detective Leve however, every suspect is asked to sign the form with the *Miranda* protocol. TR at 105. "[E]ven if they refuse [to speak to the police], we ask that they sign it." *Id*. at 105:25; 106:1; 128-129. However, police would note on the form that they answered no to answering questions and then they would have them sign. *Id*. at 128-130. Mr. Shirley stated that he understood his rights. Ex. 2 at 405. He signed and dated the form. Ex. 1. The form does not contain a notation that he refused to answer questions. *Id*.

According to Detective Leve, after Detective Garcia read Mr. Shirley his rights, he asked him if he would be willing to answer questions. Ex. 2, p. 2. Mr. Shirley stated, "[i]t depends what it is." *Id.* at p. 2; TR at 133. After some conversation about the arrest, Mr. Shirley provided a taped statement. TR at 111; Ex. 2, p. 3. At no time did Mr. Shirley say "I don't want to answer questions" or indicate that he wanted a lawyer.[3] TR11 at 111, 138. At no time did he shake his head or indicate with his body that he was done and didn't want to talk to the detectives anymore. TR at 137-38.

Before taking Mr. Shirley's statement, the detectives were not told that Mr. Shirley had previously invoked his rights. *Id.*[4] At one point during the interview,

---

[3] Mr. Shirley did ask for a lawyer at the end of the interview when detectives asked for a swab of the inside of his mouth. Ex. B at 420.

[4] While not relevant, Detective Leve was asked a hypothetical; what would he have done if he had been told that Mr. Shirley had invoked his rights the previous night before or morning before. *Id.* at 111. Detective Leve responded that he would have "still waited an appropriate amount of time, and asked him if he would have been willing to speak with [them], and noted that at that point." *Id.* at 112:1-3.

- 7 -

Detective Garcia asked Mr. Shirley if he had talked to police.  Mr. Shirley replied, "[N]o, they tried to ask me questions but I told them I know my rights."  Ex. 2, p. 12:15-16.  The interview continued and Mr. Shirley continued to answer questions that were asked of him.  Ex. 2, pp. 12-17; TR at 139.

## II.     CONCLUSIONS OF LAW

Before a person is questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way," he must first be warned that he has the right to remain silent, that any statements he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed.  *Miranda v. Arizona*, 384 U.S. 436, 467-68(1966).

### A.     Custody

Determining whether a suspect is "in custody" for purposes of *Miranda* requires application of an objective test; it depends on the objective circumstances of the interrogation and not on the subjective views of either interrogating officers or the person being questioned.  *J.D.B. v. North Carolina*, ––– U.S. ––––, 131 S.Ct. 2394, 2402 (2011); *Yarborough v. Alvarado*, 541 U.S. 652, 662–63 (2004).  Under this test, two inquiries are made: (1) what were the overall circumstances surrounding the interrogation; and (2) given those circumstances, would a reasonable person in the suspect's situation have felt free to terminate the interrogation and leave.  *Thompson v. Keohane,* 516 U.S. 99, 112 (1995*).*  The Ninth Circuit has identified several factors that are useful in evaluating the circumstances surrounding the question of custody.  These include: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at

any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." *United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008).

In the present case, it is undisputed that no *Miranda* warnings were given to Mr. Shirley during his initial encounter with officers at the home. The testimony of the officers at the scene establishes that there were at least three officers at the home and that Officer Pallanes and Officer Medina, who were wearing their uniforms and had their department-issued sidearms on their waist, went inside the home, identified Mr. Shirley, and handcuffed him. Mr. Shirley was then escorted to Sgt. Gastelum's patrol vehicle. The government argues that all this was done out of concern for Mr. Shirley's and the officers' safety because the crowd at the scene had grown from about five or six to approximately 15, and because members of the crowd appeared angry. While likely true and understandable from the officers' point of view, the Ninth Circuit has stated that the fact that these precautions may be necessary they do not "lessen their tendency to make a reasonable person believe he is in custody." *Craighead*, 539 F.3d at 1086. The court has additionally noted that "'[i]f the government is correct that the agents' actions were necessary for . . . officer safety, then it could have chosen to postpone the interrogation until a non-custodial moment, or to Mirandize." *Id*. Thus, although the questions asked of Mr. Shirley at the time of his arrest were likely not the sort prohibited under *Miranda*, the totality of the circumstances surrounding his initial detention would lead a reasonable person to believe he was in custody.

**B.     Invocation of Rights**

An accused who wishes to invoke his *Miranda* rights must do so unambiguously. *Davis v. United States*, 512 U.S.452, 461-62 (1994).  Ambiguity means having more than one interpretation or reference or having a double meaning. *Anderson v. Terhune*, 516 F.3d 781, 787 (9th Cir. 2008).  Remaining silent is insufficient to invoke a right. *Berghuis v. Thompkins*, 130 S.Ct. 2250, 2259 (2010).   However, invocation must be construed liberally. *Hoffman v. United States*, 341 U.S. 479, 486 (1951).  While a person need not rely on any special combination of words to invoke his rights, *Quinn v. United States*, 349 U.S. 155, 162 (1955), he must articulate his desire sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be an invocation of his constitutional rights. *Davis,* 512 U.S. at 459.  In determining whether a suspect invoked this right, "a court should examine the entire context in which the claimant spoke." *Bradley v. Meachum*, 918 F.2d 338, 342 (2nd Cir.1990).

**1.     Initial Invocation**

Mr. Shirley contends that he invoked his right to remain silent when, in response to Officer Pallanes' initial questioning, he responded, "I know I have the right to remain silent, so . . ."  Because, as determined above, Mr. Shirley was in custody when he made this statement, the Court agrees that it constituted an invocation of his right to remain silent.

"Once a person invokes that right to remain silent, all questioning must cease: If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Anderson v. Terhune*, 516 F.3d

- 10 -

781, 784 (9th Cir. 2008).  No particular words are required and *Miranda* requires only that the suspect "indicate[] in any manner . . . that he wishes to remain silent." *Miranda*, 384 U.S. 473-474.  Here, Mr. Shirley unambiguously invoked his right to remain silent when, in response to questioning, he informed the officer that he was aware of his right to remain silent and refused to answer questions.  The temporal relationship between the questioning and Mr. Shirley's response clearly establish his intention to remain silent. This conclusion is further evidenced by Officer Pallanes' testimony that, once Mr. Shirley invoked his right to remain silent, he ceased questioning him because he "made the determination that, if and when [Mr. Shirley] did decide to make a statement, [Officer Pallanes] wanted it to be official and recorded, documented."  Mr. Shirley's statement was a clear invocation and Officer Pallanes response illustrates that it was understood as such.

### 2. Subsequent Interview

Because Mr. Shirley invoked his right to remain silent at the time he was taken into custody, no questioning could then occur.  Nevertheless, approximately 12 hours later, Detective Leve interviewed Mr. Shirley at the jail.  Mr. Shirley argues that the statement he made to Detectives Leve and Garcia should be suppressed because it was in violation of his earlier invocation of his right to remain silent.  The government contends that the detectives, despite the earlier invocation, scrupulously honored Mr. Shirley's right to remain silent.

Once an individual invokes his right to remain silent, the Fifth Amendment requires that the invocation be "scrupulously honored" based on the right against self-

incrimination. *See United States v. Hsu*, 852 F.2d 407, 409 (9th Cir. 1988) (citing *Michigan v. Mosely*, 423 U.S. 96, 104 (1975). Among the non-exclusive list of factors used in this evaluation are the "amount of time that elapsed between interrogations, the provision of fresh warnings, the scope of the second interrogation, and the zealousness of officers in pursuing questioning after the suspect has asserted the right to silence." *Hsu*, 852 F.2d at 410 (citing *Mosely*, 423 U.S. at 104-106).

Even though *Mosely* requires that the invocation be "scrupulously honored," the Ninth Circuit has rejected the claim that:

> the inherent coerciveness of an interrogation that takes place a short period of time after the assertion of *Miranda* rights and on the same subject as to which *Miranda* was invoked is so great as to warrant a judicial injunction against any questioning such circumstances, even if it follows a fresh set of warning and a voluntary, knowing, and intelligent waiver.

*Hsu*, 852 F.2d at 410. Rather, the Ninth Circuit has adopted a flexible approach that allows a court to find that a defendant's invocation of the right to remain silent was scrupulously honored even where he is questioned for a second time only 30 minutes or less after invoking, *Hsu*, 852 F.2d at 411, or where the subject matter of the second interrogation is identical to that of the first, *Grooms v. Keeney*, 826 F.2d 883 (9th Cir. 1987). These concerns, the Ninth Circuit explains, are not of primary importance. *Hsu*, 852 at 410. It is a fresh set of warnings and the second waiver that is the focus. *Id*.

Applying these standards, the Court first notes that Detectives Leve and Garcia,

who were unaware of Mr. Shirley's previous invocation,[5] provided a fresh set of *Miranda* warnings. Ex. 1 (signed "Warnings per Miranda"); Ex. 2, p. 2 (transcript of Detective Garcia providing warnings). Moreover, coming 12 hours after Mr. Shirley was taken into custody, the second interrogation began well-beyond the 30 minute delay approved of in *Hsu*. In light of these facts, Mr. Shirley's rights can be found not to have been "scrupulously honored" only if the detectives were overzealous or coercive in their efforts to obtain a waiver. The record does not support such a finding.

Detectives Leve and Garcia did not exert any pressure on Mr. Shirley to waive his right to remain silent. Detective Garcia first read him his rights and had Mr. Shirley sign the warnings, which include a final question asking, "[n]ow, having been advised of those rights and understanding these rights, will you answer my questions?" Ex. 1. As Detective Leve explained, he has every suspect sign the form, even if they refuse to answer questions. TR at 105. However, if a suspect refuses to answer questions, Detective Leve records that decision on the form. TR at 128-130. No such notation appears on the form signed by Mr. Shirley. Ex. 1.

Additionally, the transcript of the interrogation reflects that Detective Garcia read Mr. Shirley his *Miranda* warnings and, when asked if he understood his rights, Mr. Shirley responded, "Yes." Ex. 2, p. 2. The detective then asked Mr. Shirley if he was willing to answer questions, and he responded, "It depends what it is." *Id.* In response,

---

[5] Although the detectives were unaware of Mr. Shirley's earlier invocation of his right to silence, a second interrogator's knowledge of a previous invocation is presumed. *See United States v. Covington*, 783 F.2d 1052, 1055 (9th Cir. 1985).

- 13 -

Detective Garcia tells him that they want to talk about why Mr. Shirley was at the jail and Mr. Shirley responded, "Yeah." *Id.* Then, after telling Mr. Shirley what the charges are, Mr. Shirley states that the allegations are untrue and begins to talk about the events of the preceding night. *Id.*, p. 3. Thus, the record establishes that Mr. Shirley's rights were explained to him, he indicated he understood them, told the detective he would answer questions depending on "what it is," was then told of the charges, claimed they were untrue and began to make a statement. Nothing in these events suggests that Mr. Shirley was hounded or cajoled into giving a statement or that the statement was anything other than voluntarily made.

But, Mr. Shirley contends, his response of "it depends" after the officers asked if he would talk, was ambiguous and therefore cannot amount to a knowing and voluntary waiver. He is wrong. The Ninth Circuit has held that not all waivers of *Miranda* rights must be express, and "a suspect may impliedly waive the rights by answering an officer's questions after receiving *Miranda* warnings." *United States v. Rodriguez–Preciado*, 399 F.3d 1118, 1127, amended, 416 F.3d 939 (9th Cir. 2005). "For a waiver of rights to be valid it must be voluntary, knowingly, and intelligently given. Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of the defendant." *Id.* at 1127 (quoting *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998)).

As discussed above in relation to whether Mr. Shirley's rights were "scrupulously honored," there is no evidence of the sort of coercion that would render Mr. Shirley's statement involuntary. Thus, Mr. Shirley's argument rises or falls depending on whether

- 14 -

the waiver was made knowingly and intelligently.  "A waiver is knowing and intelligent if, under the totality of the circumstances, it is made with a 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Doe*, 155 F.3d at 1074 (quoting *Moran v. Burbine,* 475 U.S. 412, 421 (1986)).  Here, Detective Leve read Mr. Shirley his *Miranda* rights in their entirety and Mr. Shirley endorsed the statement that he understood them.  Ex. 1.  His understanding of his right to remain silent is further highlighted by the undisputed fact that, when initially detained, he stated, "I know I have the right to remain silent, so . . . ."  In fact, Mr. Shirley has not argued that he did not understand his rights or the implications of waiving them.  Thus, the evidence indicates that his waiver knowing, intelligent, and valid.

### C.     Voluntariness

Statements taken in violation of *Miranda*, while inadmissible as part of the prosecution's case-in-chief, are nonetheless admissible for impeachment purposes in the event a defendant testifies at trial so long as they are  voluntary and uncoerced. *Oregon v. Hass*, 420 U.S. 714, 722-24 (1975); *Harris v. New York*, 401 U.S. 222, 224–26 (1971). Only voluntary statements are admissible.  *Malloy v. Hogan*, 378 U.S. 1, 7 (1964).  The government must prove voluntariness of a statement by a preponderance of the evidence. *United States v. Benitez*, 34 F.3d 1489, 1495 (9th Cir. 1994).  The voluntariness of a post-*Miranda* statement is analyzed in light of its independent surrounding circumstances. *Oregon v. Elstad,* 470 U.S. 298, 318 (1985).  "In evaluating voluntariness, the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the

suspect's will was overborne." *United States v. Male Juvenile,* 280 F.3d 1008, 1022 (9th Cir.2002) (citation and internal quotation marks omitted); *see also Clark v. Murphy,* 331 F.3d 1062, 1072 (9th Cir.2003). The totality of the circumstances include: the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; education; physical condition; and mental health. *Taylor v. Maddox*, 366 F.3d 992, 1016 (9th Cir. 2004). Psychological coercion is equally likely to result in involuntary statements and is just as forbidden as violent or physical interrogation tactics. *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991).

Here, even if Mr. Shirley's statement to Detective Leve could be found to violate *Miranda*, there is nothing in the record indicating it was involuntary. Because the inquiry into the voluntariness of a statement is the same as the inquiry into the voluntariness of a waiver of *Miranda* rights, s*ee Derrick v. Peterson,* 924 F.2d 813, 820 (9th Cir.1990), the discussion of voluntariness in relation to Mr. Shirley's waiver applies with equal force here. As concluded above, the record shows that Mr. Shirley was not subjected to coercion of the sort that would support a finding that his statement to Detective Leve was involuntary.

**III.    RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE**

Based on the foregoing, the Magistrate Judge recommends that the District Court, after an independent review of the record, DENY Defendant's Motion to Suppress Statements (Doc. 122).

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules

of Appellate Procedure, should not be filed until entry of the District Court's judgment. However, the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have fourteen (14) days within which to file a response to the objections. No replies are permitted without leave of court. If any objections are filed, this action should be designated case number: **CR 13-00622-TUC-RCC**. Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to de novo consideration of the issues. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 5th day of October, 2015.

*Jacqueline M. Rateau*
Jacqueline M. Rateau
United States Magistrate Judge